# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| DEBORAH JETTER, *et al.*, | : | Case No. 1:20-cv-581 |
| | : | |
| Plaintiffs, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| CITY OF CINCINNATI, | : | |
| | : | |
| Defendant. | : | |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS (DOC. 9); DENYING PLAINTIFFS' MOTION TO CERTIFY A CLASS (DOC. 7); AND GRANTING THE PARTIES' JOINT MOTION TO STAY DISCOVERY (DOC. 21)

This civil case is before the Court on Defendant City of Cincinnati's motion to dismiss (Doc. 9) and the parties' responsive memoranda (Docs. 13, 14, 17). Also before the Court is Plaintiffs' motion to certify a class (Doc. 7), and the parties' responsive memoranda (Docs. 10, 12). Finally, a joint motion to stay discovery (Doc. 21) is also before the Court.

## I. BACKGROUND

Plaintiffs Dennis and Cecil Howell; Allen and Alberta Harris; Jerilyn Isabel, and Vickie Jackson are African-Americans who own homes in the Cincinnati neighborhood of Bond Hill. (Doc. 1 at ¶¶ 4-7). Plaintiff Barbara Applebury owns a home in the Over-the-Rhine neighborhood of Cincinnati. (*Id.* at ¶ 8).[1] They all allege that the City of Cincinnati ("the City") has violated the Fair Housing Act ("FHA") because of its

---

[1] Another Plaintiff, Deobrah Jetter, voluntarily dismissed her claim. (Doc. 18).

operation of its Property Tax Abatement Program ("RTA").

The RTA is state program, but it is administered by the City in key respects. The City designates community-reinvestment areas ("CRAs") in neighborhoods in need of "revitalization." (Doc. 9 at PageID# 90). Since 2001, the City has designated <u>all</u> of Cincinnati as a CRA. (*Id.* at PageID# 92). Within the city-wide CRA, homeowners may build a new home or perform renovations on existing ones and continue to pay taxes based on their pre-improvement home value for 10-15 years. (Doc. 1 at ¶ 17). Plaintiffs' example is apt. A homeowner who builds a house for $400,000 on a $100,000 lot will continue to pay taxes as if her home is worth $100,00.00 for 15 years, saving around $8,000.00 in that time. (*Id.* at ¶ 18). The minimum amount a homeowner can spend to qualify for the abatement is either $2,500 or $5,000.[2] The Hamilton County Auditor approves applications for the abatement.  (Doc. 9, PageID# 93).

Plaintiffs allege that a disproportionate number of these tax abatements have gone to predominately "Caucasian" neighborhoods. (*Id.* at ¶¶ 23-24).[3] The City's distribution of tax abatements in this way has caused, according to Plaintiffs:

- increased home values in predominately Caucasian neighborhoods (*Id.* at ¶ 27);

---

[2] Plaintiffs allege the minimum is $5,000.00. That appears to be the minimum for owners with 3 or more units.  The City points out the minimum for a single-family household is $2,500.00. The Court does not find that this disagreement is meaningful for purposes of this motion.

[3] "Causasian" is Plaintiffs' preferred term. For present purposes, the Court will simply follow suit.

- under-development and relative decline, *i.e.*, stagnation of home values in Bond Hill and other predominately African-American neighborhoods (*Id.* at ¶ 31);

- increased segregation throughout Cincinnati and in Bond Hill as particularly alleged by several Plaintiffs (*Id.* at ¶¶4-7, 29);

- decreased mobility insofar as homeowners from predominately African-American neighborhoods like Bond Hill cannot easily enter predominately Caucasian, wealthier neighborhoods (*Id.* at ¶30);

- in the case of Plaintiff Applebury, a rise in property taxes in her redeveloping neighborhood, Over-the-Rhine, that threatens displacement of her (*Id.* at ¶8).

Plaintiffs summarize that "[t]he result for neighborhoods in Cincinnati is that Caucasian neighborhoods have become more affluent, more exclusive, and more White. African-American neighborhoods remain Black, and less affluent. Tax abatements have contributed substantially to this phenomenon." (*Id.* at ¶32).

For these reasons, Plaintiffs allege that the City has violated the FHA in implementing the RTA, and Plaintiffs seek various relief, discussed below. Plaintiffs wish to litigate this case as a class action. To that end, they have moved to certify a class and a sub-class of similarly situated individuals. (Doc. 7).

## II. LAW & ANALYSIS

The Court first addresses the motion to dismiss. For the purposes of this motion to dismiss, the Court must: (1) view the complaint in light most favorable to Plaintiff; and

3

(2) take all well-pleaded factual allegations as true. *Tackett v. M&G Polymers*, 561 F.3d 478, 488 (6th Cir. 2009).

The City first argues that the Tax Injunction Act precludes Plaintiffs' complaint. The City then moves to dismiss Plaintiffs' complaint for lack of standings and for failure to state a claim.

### A.    The Tax Injunction Act

As initial matter, this Court addresses the City's argument that Plaintiffs' suit is barred by the Tax Injunction Act ("TIA"). 28 U.S.C. § 1341.  This section states: "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."  *Id*.  The City argues this bars Plaintiffs' suit because the "heart of this case is the amount of state property taxes, whether abated or not, that is assessed and collected in the city of Cincinnati."  (Doc. 14 at 10).

The City is incorrect.  The "[Supreme] Court has interpreted and applied the TIA only in cases Congress wrote the Act to address, *i.e.*, cases in which state taxpayers seek federal-court orders enabling them to avoid paying state taxes."  *Hibbs v. Winn*, 542 U.S. 88, 107 (2004).  "§ 1341 has been read to restrain state taxpayers from instituting federal actions to contest their liability for state taxes, but not to stop third parties from pursuing constitutional challenges to tax benefits in a federal forum."  *Id*. at 108.

Here, Plaintiffs do not seek to avoid paying state taxes.  Rather, Plaintiffs challenge the racial impact of tax abatements administered in the City.  The suit is not barred by the TIA.

## B.     Subject-Matter Jurisdiction

The City first moves to dismiss Plaintiffs' complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).  The City argues that Plaintiffs lack Article III standing.  The City also contends this Court should review the motion to dismiss for lack of subject matter jurisdiction as a factual attack, and the Court should weigh the facts called into question by the City when determining if subject-matter jurisdiction exists.  (Doc. 9 at PageID# 88).

### 1.  *Standard of Review*

"Rule 12(b)(1) motions to dismiss for lack of subject-matter jurisdiction generally come in two varieties: a facial attack or a factual attack." *Gentek Bldg. Prods. v. Sherwin–Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007) (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)).  In either case, "where subject matter jurisdiction is challenged under Rule 12(b)(1), as it was here, the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Rogers v. Stratton Indus., Inc.*, 798 F.2d 913, 915 (6th Cir. 1986).

"A facial attack on the subject-matter jurisdiction alleged in the complaint questions merely the sufficiency of the pleading." *Id*.  "When reviewing a facial attack, a district court takes the allegations in the complaint as true," and construes them in the light most favorable to the nonmoving party, a safeguard similar to that employed under Federal Rule of Civil Procedure 12(b)(6).  *Id*.; *see also United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). "If those allegations establish federal claims, jurisdiction exists." *Gentek Bldg. Prods.*, 491 F.3d at 330.

"A factual attack is a challenge to the factual existence of subject matter jurisdiction." *Golf Vill. N., LLC v. City of Powell, Ohio*, 338 F. Supp. 3d 700, 704 (S.D. Ohio 2018) (citing *Ritchie*, 15 F.3d at 598). "When a Rule 12(b)(1) motion attacks the factual basis for jurisdiction, the district court must weigh the evidence and the plaintiff has the burden of proving that the court has jurisdiction over the subject matter." *Golden v. Gorno Bros., Inc.*, 410 F.3d 879, 881 (6th Cir. 2005).

"But a district court engages in a factual inquiry regarding the complaint's allegations only when the facts necessary to sustain jurisdiction do not implicate the merits of the plaintiff's claim." *Gentek*, 491 F.3d 320, 330 (citing *Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1261 (11th Cir.1997)). In other words, "the district court is prohibited from making factual findings with respect to a jurisdictional issue when such a finding would adversely affect the merits of the plaintiff's case." *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 443–44 (6th Cir. 2012) "When 'an attack on subject-matter jurisdiction also implicates an element of the cause of action, then the district court should find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's claim.'" *Id*. (quoting *Gentek*, 491 F.3d at 330).

The City suggests this is a "factual attack" because it is challenging Plaintiffs' allegations related to the City's implementation of residential tax abatements. The City directs the Court's attention to Ohio state law as its factual attack. Any findings related to the City's implementation of Ohio's residential tax abatement law would go directly to the merits of Plaintiffs' case – whether the City's tax abatement procedure violates the FHA.

Accordingly, the Court makes no jurisdictional findings of fact, and will review the City's subject-matter jurisdiction challenge as a facial attack.

### 2. *Article III Standing*

Federal courts are vested with jurisdiction to address "actual cases and controversies." *Coalition for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 458 (6th Cir. 2004) (citing U.S. CONST. art III, § 2). The doctrine is an evolving body of law with its "core component" being "the case-or-controversy requirement of Article III," but "some of its elements express merely prudential considerations that are part of judicial self-government." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992). "The doctrine of standing, which is derived from Article III, requires a plaintiff to have a 'personal stake in the outcome of the controversy.'" *Foster v. Health Recovery Servs., Inc.*, No. 2:19-CV-4453, 2020 WL 5943021, at *3 (S.D. Ohio Oct. 7, 2020) (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). "Whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute. *Ass'n of Data Processing Serv. Organizations, Inc. v. Camp*, 397 U.S. 150, 153, (1970). "The [standing] requirement at issue is in reality tied to a particular statute." *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1302, 197 L. Ed. 2d 678 (2017) (discussing standing in the context of an FHA claim).

The FHA casts a wide "zone of interests." *Id.* Any "aggrieved person" may bring a lawsuit under the FHA. 42 U.S.C. § 3613(a)(1)(A). An aggrieved person is one who either "claims to have been injured by a discriminatory housing practice" or anyone who "believes" they "will be injured by a discriminatory housing practice about to occur." 42

U.S.C. § 3602(i). In interpreting the statute, courts have stated the FHA codifies "a congressional intention to define standing as broadly as is permitted by Article III of the Constitution." *Bank of Am. Corp. v. City of Miami*., 137 S. Ct. 1296, 1298 (2017) (quoting *Trafficante v. Metropolitan Life Ins. Co*., 409 U.S. 205 (1972)).

To satisfy standing, the Supreme Court requires a plaintiff to have: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "Where, as here, a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating each element." *Id*. (internal quotation omitted).

### a. Injury in Fact

The City claims the Plaintiffs fail to meet the injury-in-fact element of standing because Plaintiffs' alleged injuries are not "concrete and particularized." (Doc. 9, PageID# 95). Plaintiffs alleged harms are "speculative"; that the complaint "lacks any facts demonstrating alleged discrimination"; and that none of the existing Plaintiffs applied for the RTA. (*Id.* at PageID# 96). The City thus concludes that the Plaintiffs alleged harms are "conjectural and hypothetical" rather than "actual and imminent." (*Id.*)

On the contrary, the Court finds the Plaintiffs have pleaded injuries cognizable under the FHA. Among other things, Plaintiffs allege the City's implementation of the RTA has caused their neighborhoods to become more segregated. For example, three Plaintiffs live in Bond Hill and allege the neighborhood has become increasingly

segregated because of the City's implementation of the RTA. (Doc. 1 at ¶¶2-7, 29).[4] The loss of interracial associations is a long-recognized injury sufficient to confer standing under the FHA. *See e.g., Havens Realty Corp. v. Coleman*, 455 U.S. 363, 376 (1982) (finding the loss of "social and professional benefits of living in an integrated society" a sufficient injury).

In fact, the alleged injury here is nearly indistinguishable from that alleged in *Gladstone Realtors v. Bellwood*, a case the City cites but does not otherwise discuss. 441 U.S. 91, 99 (1979). In *Gladstone Realtors*, a municipality alleged that realtors' sales practices caused racial imbalance and economic diminution in home values within a defined geographic area. 441 U.S. 91, 92 (1979). Here, if anything, the relationship is more direct because the homeowners of the segregated neighborhoods, suffering from economic diminution in home values, assert the claims for themselves.

The City states "the Complaint is devoid of any allegation that any of the eight named Plaintiffs participated or sought to participate in the City's RTA." (Doc. 9 at PageID# 95). That is true. But two Plaintiffs state they cannot afford the minimum expenditure. (Doc. 1 at ¶¶ 6-7). More importantly, the commonly alleged injury is not that individual applications are approved or denied on a discriminatory basis. It is that the implementation of the RTA, writ-large, that has caused housing segregation and other harms.

---

[4] The only other lead Plaintiff, Barbara Applebury, lives in Over-the-Rhine and alleges the influx of CRT abatements into that neighborhood has caused her property taxes to increase such that she may be forced out. This flips the script but results in the same injury: the loss of an integrated neighborhood.

The alleged injuries may or may not be provably connected to the RTA policy but, as pleaded, they are not speculative.

### b. Traceable to Challenged Conduct of the Defendant

The City claims the alleged injury is not traceable to City officials. (Doc. 9 at PageID# 97). In uncontradicted assertions, the City says County Auditors assess property values and award tax abatements. (*Id.*). The City states it simply follows its legal obligations under state law and forwards the abatements. (*Id.* at PageID#99). Thus, the City concludes the alleged injury is not traceable to City actions.

The Court disagrees that the City has no discretion in administering the RTA. As it admits, the City designates the tracts that are eligible for the CRA. (Doc. 9 at 15, n.5) ("…Cincinnati Ordinance 276-2017 establishes the City's residential CRA policy.") Using that discretion, the City has determined that all of Cincinnati meets the CRA criteria, from 2001 to the present, so all of Cincinnati is eligible for the RTA. (Doc. 9 at 15). According to Plaintiffs, it is that choice, made at the City level, that has led to a huge influx of resources to Caucasian neighborhoods, the underdevelopment of African-American ones, and the resultant harms alleged. Plaintiffs also allege the City has not done anything to counter the trends hastened by the RTA. (Doc. 1 at ¶6). Giving Plaintiffs the benefit of reasonable inferences, the Court finds that the conduct complained of is plausibly traceable to the City's choices in implementing the RTA.

### c. Redressable by a Favorable Judicial Ruling

The City claims Plaintiffs must, but fail to, "show that a favorable judicial ruling will remove the harm they suffer." (Doc. 9 at PageID# 100) (quoting *Warth v. Seldin*, 422

U.S. 490, 505 (1975)). The City's argument here, specifically, takes issue with Plaintiffs' demands for relief. As remedies for the alleged wrongs, Plaintiffs ask the Court pause abatements to Caucasian neighborhoods, provide them to African-American neighborhoods in parity with Caucasian neigborhoods; or give African-Americans a 100% tax abatement for 10 years. (Doc. 1, PageID# 12-13). Other demands include an order establishing an outreach program to help African-Americans obtain the residential tax abatement; and tax relief that would offset increases in property taxes resulting from the RTA. (*Id.*).

The Court agrees with the City, on a preliminary basis, that several of the demands for relief are constitutionally questionable. In FHA cases in particular "courts should strive to design [remedies] to eliminate racial disparities through race-neutral means." *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc*., 576 U.S. 519, 544–545 (2015). Doubling down on the point, the *Inclusive Communities* Court cautioned that "[r]emedial orders that impose racial targets or quotas might raise more difficult constitutional questions." *Id*. at 45. Indeed, a remedy that directed tax abatements based solely on race could run afoul of Equal Protection Clause. *See, e.g.*, *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 730 (2007).

These are serious issues but not fatal to Plaintiffs' complaint at this stage. Plaintiffs demand for an outreach effort directed toward African-American neighborhoods appears, without any briefing to the contrary, to be both constitutionally inoffensive and in line with remedies applied by district courts in other FHA cases. *See United States v. City of Parma, Ohio*, 661 F.2d 562, 576 (6th Cir. 1981) (upholding a

district court remedy wherein it ordered a city "advertising" campaign to address FHA violations).

Additionally, the Court finds that the general demand for relief ("further and other relief") authorizes this Court to consider, if liability is established, a range of remedies. *Tigrett v. Cooper*, 855 F. Supp. 2d 733, 744 (W.D. Tenn. 2012) ("Under the general prayers for relief in a complaint, it appears to be widely accepted that district courts retain discretion to extend relief beyond the bounds of the specific prayers for relief requested in a complaint.").  Flexibility in crafting relief to fit the scope of an FHA violation is also a well-established principle. The FHA itself grants district courts the authority to "order such affirmative action as may be appropriate" to remedy a violation. 42 U.S.C. §3613(c)(1). Moreover, "[a]ppropriate relief for violations of the [FHA] is to be determined on a case-by-case basis … with relief tailored in each instance to the needs of the particular situation." *United States v. Jamestown Ctr.-In-The-Grove Apartments*, 557 F.2d 1079, 1080 (5th Cir. 1977). For these reasons, the Court does not consider itself bound by Plaintiffs' prayer for relief or the Constitutionally questionable remedies therein.

The Court is satisfied that a favorable judicial ruling could indeed remedy the harms of which Plaintiffs complains.

### 3. *Failure to State a Claim*

#### a. Standard of Review

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) operates to test the sufficiency of the complaint and provides for dismissal of a complaint for "failure to state

a claim upon which relief can be granted."  To show grounds for relief, Fed. R. Civ. P.

8(a) requires that the complaint contain a "short and plain statement of the claim showing

that the pleader is entitled to relief."

    While Fed. R. Civ. P. 8 "does not require 'detailed factual allegations,' . . . it

demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 555 (2007)).  Pleadings offering mere "'labels and conclusions' or 'a formulaic

recitation of the elements of a cause of action will not do.'"  *Id.* (citing *Twombly*, 550

U.S. at 555).  In fact, in determining a motion to dismiss, "courts 'are not bound to accept

as true a legal conclusion couched as a factual allegation[.]'"  *Twombly*, 550 U.S. at 555

(citing *Papasan v. Allain*, 478 U.S. 265 (1986)).  Further, "[f]actual allegations must be

enough to raise a right to relief above the speculative level[.]"  *Id.*

    Accordingly, "[t]o survive a motion to dismiss, a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'"  *Iqbal*, 556 U.S. at 678.  A claim is plausible where "plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged."  *Id.*  Plausibility "is not akin to a 'probability requirement,'

but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*

"[W]here the well-pleaded facts do not permit the court to infer more than the mere

possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the

pleader is entitled to relief,'" and the case shall be dismissed.  *Id.* (citing Fed. Rule Civ.

P. 8(a)(2)).

b. Disparate Treatment Claim

In a typical disparate-treatment case against a municipal policy, a plaintiff "establishes a prima facie case by showing that animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive. *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016).

Plaintiffs invoke the word "intentional" to describe the alleged misconduct, raising the possibility they are moving under a disparate-treatment claim as opposed to a disparate-impact claim exclusively. (Doc. 1 at ¶¶1,36); *see Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 909 (5th Cir. 2019) ("Disparate treatment is deliberate discrimination."). To the extent Plaintiffs have asserted a cause of action alleging disparate treatment, it must fail. Plaintiffs do not plead any non-conclusory facts suggesting race-based animus played any role in the development of the RTA policy. Beyond using the word "intentional," Plaintiffs state no factual bases for a disparate-treatment claim.

Thus, under either Plaintiffs' or the City's proposed framework for the Court's scrutiny of a pleading, Plaintiffs lack a cause of action for a disparate treatment claim under the FHA.

c. Disparate Impact Claims

In contrast to a disparate treatment case, a plaintiff bringing a disparate impact claim challenges practices that have a "disproportionately adverse effect on minorities" and are otherwise unjustified by a legitimate rationale. *Texas Dep't of Hous. & Cmty.*

14

*Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 524 (2015). However, according to precedent set in *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project* courts must consider at least two important "safeguards" when analyzing a disparate impact claim. *Id.*

First, defendants in disparate impact claims are allowed "leeway to state and explain the valid interest served by their policies." *Id.* at 541. Courts should not read the FHA "to impose onerous costs on actors who encourage revitalizing dilapidated housing in our Nation's cities merely because some other priority might seem preferable." *Id.* Accordingly, "[g]overnmental or private policies are not contrary to the disparate-impact requirement unless they are "artificial, arbitrary, and unnecessary barriers." *Id.* at 543 quoting *Griggs v. Duke Power Co.,* 401 U.S. 424 (1971).

Second, according to the court in *Inclusive Communities*, disparate-impact plaintiffs must show a "robust causal connection" between the policy and the harm. Importantly, "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity. A robust causality requirement ensures that "[r]acial imbalance ... does not, without more, establish a prima facie case of disparate impact." *Inclusive Communities*, 576 U.S. at 542 (2015). "A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact." *Id.* at 543.

Before getting to the substantive portions of the doctrine, the City complains that Plaintiffs have not cited a specific section of the FHA and therefore have not properly put

the City on notice. (Doc. 9 at PageID# 107). The Court disagrees. There is no command in the Federal Rules demanding a certain mode of citation in a complaint. Rather, as stated, a pleading must state the basis for jurisdiction and contain a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). Plaintiffs have done as much, alleging jurisdiction under the FHA and stating that the City's implementation of a tax credit program causes various harms affecting African-Americans disproportionately. The City is fairly on notice of allegations it must defend against.

The City argues that Plaintiffs have not alleged facts showing the RTA is an "artificial, arbitrary or unnecessary barrier" to fair housing. (*Id.* at PageID# 111). But Plaintiffs alleged facts that, if true, would establish harm to African-Americans caused by tax abatements that those Caucasian neighborhoods arguably do not need. This is a main concern of the complaint—whiter and more affluent neighborhoods are getting a lion's share of tax incentives intended for areas in need of revitalization. The Court is satisfied that Plaintiffs properly allege that the policy does create an unnecessary barrier to fair housing.

In support of the RTA as good policy, the City cites its laudable goals like "the retention of residents across all City neighborhoods." (*Id.* at PageID# 112). However, only after Plaintiff makes its prima facie case does the burden move to the government to show its legitimate objectives. This case is not there yet. *See Graoch Assocs. # 33, L.P. v. Louisville/Jefferson Cty. Metro Hum. Rels. Comm'n*, 508 F.3d 366, 373 (6th Cir. 2007) (discussing the framework to a disparate impact claim under the FHA and points at which

16

the evidentiary burden shifts); *see also Nat'l Fair Hous. All. v. Travelers Indem. Co.*, 261 F. Supp. 3d 20, 29 (D.D.C. 2017) ("Other limitations on disparate-impact liability take effect at different stages—for example, defendants must have leeway to state and explain the valid interest served by the challenged policies at the <u>rebuttal</u> stage.") (emphasis added, internal citations omitted). Thus, the City's arguments justifying the RTA based on its policy objectives are premature.

The City also alleges that "Plaintiffs offer no robust causal evidence of their extraordinarily broad claim that the City's RTA is the cause of their alleged harm." (*Id.* at PageID# 106). For the Court, the City's argument here raises the important question of whether *Inclusive Communities'* "robust causality" requirement demands "evidence" or "statistics" at the pleadings stage.

To revisit some of the relevant language from *Inclusive Communities*, the court there stated "[a] plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact." 576 U.S. at 543 (2015). Federal courts have split on how to interpret the language.[5]

Here, the Court adopts the persuasive reasoning of its sister court in the Southern District of Ohio case *Seattle House, LLC v. City of Delaware, Ohio*. No. 2:20-CV-3284, 2021 WL 3284742, at *5 (S.D. Ohio Aug. 2, 2021). That court determined, and this

---

[5] The Fifth Circuit identified four views of the robust causality requirement and discusses how that requirement interacts with evidentiary burdens et al. *Inclusive Communities Project, Inc. v. Lincoln Prop. Co*., 920 F.3d 890, 903 (5th Cir. 2019), cert. denied, 140 S. Ct. 2506, 206 L. Ed. 2d 462 (2020).

Court agrees, that *Inclusive Communities* did not create a "heightened burden on the pleadings for a disparate impact claim…." *Id.* The court in *Seattle House*, in turn, quotes a Southern District of New York case persuasively stating:

> [*Inclusive Communities*] emphasized that statistics demonstrating a racial disparity in a particular location, without an adequate showing of a causal connection to the challenged policy, would not be sufficient to establish a prima facie case of disparate impact. But a prima facie case is an evidentiary standard, and not a pleading requirement. ICP did not alter the plausibility standard for pleading, which requires only the plaintiff plead allegations that plausibly give rise to an inference that the challenged policy causes a disparate impact. Nor does ICP require Plaintiffs to proffer statistical evidence of disparate impact, if other facts are pleaded that support the inference. *Id.* (quoting *Winfield v. City of N.Y.*, 2016 U.S. Dist. LEXIS 146919, at *20 (S.D.N.Y. Oct. 24, 2016)).

The persuasive force of such orders is bolstered by common intuition and a recent regulation, promulgated by Department of Housing and Urban Development ("HUD"), regarding disparate impact claims specifically. The *Inclusive Communities* court did not say it was altering a pleading standard. Moreover, the requirement of evidence at the pleading stage would not just heighten a pleading standard but, essentially, collapse several stages of civil procedure into a single step. Meanwhile, a recent HUD regulation—one that is clearly attempting to codify *Inclusive Communities*—states that a Plaintiff must "sufficiently plead facts to support" among other elements, "that there is a robust causal link…." *See* 24 C.F.R. § 100.500.

For these reasons, the regular plausibility standard ought to apply. Accordingly, Plaintiffs' disparate impact claim will survive a motion to dismiss if Plaintiffs allege facts establishing that a "robust causation" between the policy and the harm is plausible.

With that standard in mind, the Court turns to Plaintiffs alleged facts. The allegation generally is that the implementation of the CRT has caused racial segregation. "The tax abatement program…. has resulted in the significant new construction of single-family homes, and condominiums in Caucasian neighborhoods in Cincinnati, thereby increasing property values and the personal wealth of Caucasian homeowners." (Doc. 1 at ¶27). In turn, Plaintiffs allege, population growth has accelerated in those neighborhoods. (*Id.* at ¶28). The influx of money and people into predominately Caucasian neighborhoods has allegedly increased the cost of moving into those neighborhoods from the predominately African-American black neighborhoods, like Bond Hill. At the same time, "there has been minimal tax abatement activity in African American neighborhoods where property values have remained relatively flat ...." (*Id.* at ¶31).

Plaintiffs also provide numbers. The city has abated more than $180 million in taxes.[6] About half of those abatement dollars have gone to Caucasian neighborhoods and 29% to a single one—Hyde Park. (*Id.* at ¶ 24). African-American neighborhoods have received considerably less in way of tax abatements, and perhaps as little as 20%. (*Id.* at ¶¶24-25).

The City does not refute the segregated-nature of recent housing patterns. Instead, the City claims the RTA is not the cause. (Doc. 9 at PageID# 112). The City states that

---

[6] The complaint does not say how long of a period it is examining with regards to RTAs awarded. However, Plaintiffs direct the Court to the City's tracker of RTAs at https://insights.cincinnati-oh.gov/stories/s/residential-tax-abatemetns/kceu-xqtz/. (Doc. 1 at ¶23). Analyzing that tracker, the Court's best inference is that the Plaintiff-cited figures account for RTA activity from roughly 2015 up until the complaint was filed.

such issues have "myriad causes including but not limited to, the 2008 housing market collapse, a national failure to increase salaries consistent with cost-of-living, or the decades-long history of "white flight…." (*Id.*). The City concludes that "this conclusory allegation that seeks to identify the City's RTA as the exclusive cause of economic racial inequities should be rejected outright." (*Id.*).

The City is probably correct about the "myriad causes" of segregation and stagnant home prices in African-American neighborhoods.  After all, "[t]he housing market is interconnected with economic and social life." *City of Miami*, 137 S. Ct. at 1306 (2017)." The Court is not convinced, though, that Plaintiffs must prove that the operation of the RTA is the <u>exclusive</u> driver of the harms they allege. If that were the case, no FHA litigation attacking municipal policies would ever get beyond the pleadings stage.  Instead, the inquiry ought to focus on whether the facts alleged create a plausible inference of "robust" causal relationship between the policy and the harm alleged.

In this case, giving the benefit of reasonable inferences to the Plaintiffs, the Court finds Plaintiffs have pleaded facts suggesting "robust causation" is at least plausible.  The City's policy is that it has decided to make a powerful tax abatement available to every homeowner in the City. While available to every homeowner, the tax credits, have gone disproportionately, and in very large numbers, to predominately Caucasian neighborhoods. Given the scale of the program, the idea that such disproportionate distribution would cause the harms alleged is plausible—even if it is no more than that at this stage. Plaintiffs have therefore adequately pleaded a disparate-impact claim.

In summary, the Court finds Plaintiffs have not pleaded a cause of action based on intentional discrimination. To the extent any intentional discrimination claim is before the Court, it is hereby dismissed. On the other hand, the Court has found Plaintiffs may go forth with their disparate impact claim under the FHA.

**C.      The Motion for Class Certification**

Plaintiffs' motion for class certification is also before this Court. (Doc. 7). Plaintiffs seek to represent a primary class and a sub-class. The proposed primary class is defined as:

> [A]ll African -American homeowners in the predominately African-American neighborhoods of Cincinnati—including Avondale, Bond Hill, College Hill, English Woods, Evanston, Kennedy Heights, Madisonville, Millvale, Mount Airy, Mount Auburn, North Avondale, North Fairmont, Paddock Hills, Pendelton, Roselawn, South Cumminsville, Walnut Hills, Winton Hills, and the West End. (Doc. 7 at 2).

Plaintiffs propose a subclass consisting of:

> "[a]ny African American homeowner in Madisonville, Over-the- Rhine, and Walnut Hills[7] who has not received a Residential Tax Abatement but who never-the-less has experienced a raising of their property taxes by more than 5% higher than the average raise for all homeowners in Cincinnati." (*Id.*).

1. ***Standard of Review***

Class actions constitute "an exception to usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1978). "In order to justify a departure from that rule, 'a class representative must be part of the class and possess the same interest and suffer the same injury as the class

---

[7] Whether intended by Plaintiffs or not, Walnut Hills appears as a relevant neighborhood in both the primary class and the subclass.

members.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-49 (2011) (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)). To obtain class certification, a plaintiff must meet each of the four prerequisites contained in Federal Rule of Civil Procedure 23(a)—numerosity, commonality, typicality, and adequate representation. *Zehentbauer Family Land, LP v. Chesapeake Expl. LLC*, 935 F.3d 496, 503 (6th Cir. 2019).

"[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). This rigorous analysis may require "the court to probe behind the pleadings before coming to rest on the certification question." *Id.* However, courts do not have "license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

In addition to meeting the four criteria in Rule 23(a), a plaintiff must demonstrate that the putative class complies with at least one of the requirements of Rule 23(b). *Id.* Here, Plaintiffs seeks certification of the class pursuant to Rule 23(b)(2). (Doc.7 at 2-3). A court may certify a class under Rule 23(b)(2) if (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

a. Numerosity

While there is no strict numerical threshold, "[o]ften, a class of 40 or more members is sufficient to meet the numerosity requirement.'" *Dillow v. Home Care Network, Inc.*, No. 1:16-cv-612, 2017 WL 2418738, at *2 (S.D. Ohio June 5, 2017)

(cleaning up). Plaintiff credibly alleges the proposed putative class would number in the "tens of thousands." (Doc. 1 at ¶¶ 3-4). The Court agrees with Plaintiffs that the proposed class is so numerous as to make joinder unpracticable.

For its part, the City does not contend that the number of putative class members would be small. Instead, it revives what is essentially its standing argument. Accepting the class descriptions at face value, the putative class clearly meets the numerosity requirement. Fed. R. Civ. P. 23(a)(1).

> b. <u>Commonality and Typicality</u>

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Although the Rule "speaks of 'questions' in the plural," the Sixth Circuit has held that "one question common to the class" satisfies this requirement. *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998). As the Supreme Court explained in *Tyson Foods, Inc. v. Bouaphakeo*, "[a]n individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" 136 S. Ct. 1036, 1045 (2016) (quoting 2 W. Rubenstein, Newberg, Newberg on Class Actions § 4:50, pp. 196-197 (5th ed. 2012)).

Commonality does not require "the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Zehentbauer*, 935 F.3d at 503 (quoting Wal-Mart, 564 U.S. at 350). Said another way, commonality is met when determining the

23

"truth or falsity" of a common contention "will resolve an issue that is central to the validity of each one of the claims in one stroke," advancing the litigation. *Wal-Mart*, 564 U.S. at 350; *Sprague*, 133 F.3d at 397.

To recap, there are five named Plaintiff households—four from Bond Hill and one from Over-the-Rhine. The Bond Hill Plaintiffs, essentially representatives of the primary class, complain of neighborhood decay, segregation, stagnant property values and their inability to afford the minimum tax-abatement expenditure. The Over-the-Rhine Plaintiff additionally complains of rising tax burden caused by RTA-spurred development. These five households from two neighborhoods assert that their claims are typical of the tens of thousands of African-American homeowners across all predominately African-American communities in Cincinnati.

With this specific dynamic in mind, the Court finds Plaintiffs have not made the requisite showing of commonality. As proposed, Plaintiffs' class would encompass the homeowners in the described neighborhoods who have received the RTA, those who cannot afford it; and those who have applied for it and been rejected. It would embrace homeowners whose property values had sky-rocketed, stagnated, or decreased. The class description would potentially include homeowners who both have and have not lost the benefit of interracial associations. It strikes the Court as intuitive that several members of the proposed class may have no claims at all.

Plaintiffs' specific points of contention bring the commonality problem into sharper relief.  For example, Plaintiffs claim all class members "want to live in a non-racially segregated city." (Doc. 7 at 7). For such a blanket assertion to hold true across

24

such a huge population beggars belief. Even if it were true, the Court notes there is a difference between <u>wanting</u> to live in a non-segregated city and experiencing the loss of interracial relations. The Court is not clear that merely wanting an integrated neighborhood is a cognizable claim under the FHA.

Plaintiffs also assert a common question that allegedly unifies all members of the proposed class: "Whether the RTA program has produced racially segregative effects." (Doc. 12 at 3). As with the class description, the Court discerns a problem of breadth here. "Segregative effects" could include a lot of potential harms. Not all segregative effects are cognizable injuries. It is plausible some segregative effects are caused by the RTA while others are not. Connecting the RTA to different segregative effects would likely entail different inquiries and evidence. And the Court anticipates different "segregative effects" would require different remedies. In other words, the issue— defined so broadly—is not "susceptible to generalized, class-wide proof." *Tyson*, 136 S. Ct. at 1045 (2016). The practical upshot of this is that litigation held together only by a question of "segregative effects" allegedly cause by the RTA would very likely become unwieldy, undercutting the core function of class resolution in the first place.

For largely the same reasons, Plaintiffs have not met their burden in demonstrating typicality. Federal Rule of Civil Procedure 23(a)(3) requires plaintiffs to demonstrate that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." "Typicality is met if the class members' claims are 'fairly encompassed by the named plaintiffs' claims.'" *Hendricks v. Total Quality Logistics*, LLC, No. 1:10-cv-649, 2019 WL 2387206, at *7 (S.D. Ohio Mar. 22, 2019) (quoting *Sprague*, 133 F.3d at

399). The purpose of the requirement is to ensure that the representatives' interests and the interests of the class members are aligned. *Id.* "Many courts have found typicality if the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct, or if they are based on the same legal or remedial theory." *Rikos*, 799 F.3d at 509 (quoting *Charles Alan Wright, Arthur R. Miller & Mary Kay Kane*, 7A Federal Practice and Procedure § 1764 (3d ed. 2005)).

As the City notes, those African American homeowners who have received the tax abatement or may want to apply for it may have divergent interests from those who cannot afford it. Moreover, members of the sub-class—African-American homeowners in Over-the-Rhine, Madisonville, and Walnut Hills whose property taxes have increased by more than 5% compared to the average Cincinnati homeowner—are not all at risk of displacement in the way Plaintiff Appelbury alleges she is. It seems intuitive that many in the sub-class would naturally want the RTA-initiated development to continue so that their property values continue to rise. Thus, the Court is not persuaded the named Plaintiffs claims are typical of the class or sub-class.

c. Adequacy

The adequacy of representation requirement of Rule 23(a)(4) ensures that "the representative parties will fairly and adequately protect the interests of the class." This requirement has two components: (1) the representatives must have common interests with the unnamed class members, and (2) it must appear that the representatives will vigorously prosecute the class action through qualified counsel. *See Rikos*, No. 1:11-cv-

26

225, 2018 WL 2009681, at *5 (S.D. Ohio Apr. 30, 2018) (citing *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 524-25 (6th Cir. 1976)).

Because the proposed class lacks typicality and commonality, the Court is likewise concerned about the adequacy of representation. The proposed class and the range of possible remedies are each very broad.  It is therefore not hard to imagine situations where members of the class are at cross-purposes, with various members prioritizing integration, property values, tax burdens, and any other number of concerns. The Court finds Plaintiffs have not demonstrated that the class representatives will adequately represent the interests of absent class members because, among other reasons, the interests of absent class members is incredibly broad territory.

Having found Plaintiffs have not shown the necessary class prerequisites, the Court will not reach the question of qualifications of Plaintiffs' counsel (although it is self-evident) nor the further demands of Rule 23(b)(2). The Court will deny the motion to certify the proposed class and subclass for the reasons stated.

As should be clear from the Court's analyses of the Rule 23(a) factors, the class description proposed by Plaintiffs is simply too broad given the allegations of the complaint. That said, "[a] district court's order denying or granting class status is inherently tentative. District courts have the discretion and even the obligation to reassess their class rulings as the case develops." *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.,* 302 F.R.D. 448, 459 (N.D. Ohio 2014) (cleaned up). With this in mind, the Court denies Plaintiffs' motion to certify a class without prejudice to a renewed motion for class certification.

## IV.  CONCLUSION

Based upon the foregoing,

1.   Defendant's motion to dismiss (Doc.9) is **GRANTED in PART and DENIED in PART** as follows:

    a.  Defendant's motion is GRANTED as it relates to any of Plaintiffs' claims for intentional discrimination or disparate <u>treatment</u> under the FHA.

    b.  Defendant's motion is DENIED with regards to Plaintiffs' disparate <u>impact</u> claims under the FHA; Plaintiffs may proceed with disparate impact claims.

2.   Plaintiffs' motion to certify a class is **DENIED** (Doc. 7) without prejudice.

3.   The parties' joint motion to stay discovery is **GRANTED. (Doc. 21)**. The Court anticipates setting a discovery schedule after Defendant has interposed an answer and the Court has held a Preliminary Pretrial Conference.

   .

**IT IS SO ORDERED.**

Date:   9/30/2021

                              Timothy S. Black
                              United States District Judge